IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2004 Session

## ANTHONY REID v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bradley County**
**Case No. M-02-768      Carroll L. Ross, Judge**

---

**No. E2003-01953-CCA-R3-PC**
**March 29, 2004**

---

A Bradley County jury convicted the Petitioner, Anthony Reid, of first degree felony murder, especially aggravated robbery, aggravated robbery, attempted aggravated robbery and evading arrest. The trial court imposed an effective sentence of life plus twenty-five years. On direct appeal, this Court affirmed the convictions, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. The Petitioner then sought post-conviction relief in the trial court, alleging that he was denied effective assistance of counsel on direct appeal because his counsel failed to raise the issue of the sufficiency of the convicting evidence. Following a hearing, the post-conviction court dismissed the petition. In this appeal, the Petitioner contends that it was "per se" ineffective assistance of counsel for trial counsel to fail to raise the issue of the sufficiency of the convicting evidence on direct appeal. Finding no error, we affirm the trial court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, joined.

Larry D. Wright, Cleveland, Tennessee, for the Petitioner, Anthony Reid.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Stephen D. Crump, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Factual Background

This Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

> On May 22, 1998, Lebron Hensley, a patrolman for the Cleveland Police
> Department, received a report that a shooting had occurred at the apartment complex

located at 580 Dooley Street in the city of Cleveland. The first officer to arrive at the scene, Hensley observed two gunshot victims on a balcony of one of the apartments. One victim was sitting in a chair and bleeding from the head. The other was lying on the floor face down in a pool of blood. Hensley immediately checked their condition. The victim in the chair was conscious but unresponsive--he was leaning over with his face in his hands and appeared to have been shot somewhere in the head. The victim on the ground exhibited no vital signs at all. Within a matter of minutes, the ambulance and additional officers arrived at the scene. The victims on the balcony were later identified as Kenneth Blair and Charles Massengill. Blair was the victim on the ground, and Massengill was seated in the chair. Hensley did not see any other victims at that time.

. . . .

Once the victims were removed for medical treatment, Gates and the other police officers began interviewing witnesses and searching the area for evidence. The police located a set of keys belonging to one of the victims, several spent rounds of ammunition (later identified as .22 caliber shell casings), a baseball cap, and a bottle of some kind of alcoholic beverage in the gravel parking lot below the stairs. County officials reported spotting persons and a car matching the witnesses' description of the suspects and their vehicle: three black males in a small, white four-door car, with a "drive-out tag" in the rear window.

Jimmy Woody, a patrolman for the Bradley County Sheriff's Office, testified that he was one of the police officers involved in the pursuit of the shooting suspects. The chase began shortly after Officer Paul Leroy initially spotted the suspects' vehicle near the Waffle House on Georgetown Road. Leroy reported observing the vehicle drive onto Interstate 75, near exit 25, and he followed it for several miles while waiting for assistance. When the suspects reached exit 33, Woody was within a mile of Leroy and both officers activated their blue lights and sirens. The suspects responded by accelerating. They drove recklessly, at speeds of 70 to 80 miles per hour, constantly switching lanes and also traveling in the emergency lane. The chase continued for approximately two miles. Then the driver of the vehicle suddenly pulled over and stopped the car in the median on the left side of the interstate, between the Charleston exit and the river on the northbound side. The passenger in the front seat remained in the vehicle, but the driver and backseat passenger leaped out of the car and ran west toward the southbound lane. Sergeant Collins and Clancy Bryson, also involved in the pursuit, chased the fleeing suspects on foot. One was captured in the woods, and the other was apprehended sometime later near the truck stop at exit 33. Woody identified Defendant as the driver of the vehicle, but did not testify as to whether Defendant was the suspect captured in the woods or the one apprehended later, near the truckstop.

-2-

Sergeant John Collins, a patrolman for the Bradley County Sheriff's Office, testified that he also participated in the pursuit of Defendant. As the officers were closing in on the vehicle, Collins made eye contact with the driver, who grinned at him as he pulled alongside the suspects. Collins identified Defendant as the smiling driver and corroborated the testimony given by Officer Woody regarding the pursuit. Collins also confirmed that both he and Officer Bryson chased the two suspects who fled on foot. Apprehending the first suspect rather quickly, the officers then searched the woods with police dogs for the second but were initially unsuccessful. Upon returning to their units, a dispatcher informed them that someone from the truck stop at exit 33 reported a person matching the description of the missing suspect standing on the interstate trying to flag a ride. Detective Quinn drove to the exit and picked him up. During his testimony, Collins was not asked whether Defendant was the first suspect, apprehended in the woods, or the one discovered later at the truckstop.

Steve Bennett, a detective with the Cleveland Police Department, testified that he assisted with the search of the crime scene and the defendants' car after they were apprehended. At the scene of the shooting, the police found five .22 shell casings. Inside the car, the police discovered two boxes of .22 rimfire ammunition, a black stocking-type mask, a cap, and articles of clothing. Two days later, on Interstate 75, northbound, the police also discovered the three guns involved in the crime: a .22 caliber revolver pistol, a Phoenix .22 caliber semi-automatic pistol, and a Haskell .45 caliber semi-automatic pistol. Two of the weapons were wrapped in a black shirt, and the third was laying close by. The particular type of .22 revolver discovered on the interstate can hold six rounds in its chamber, and it contained five rounds when the police found it. The Phoenix .22 semi-automatic is capable of holding eight rounds, fully loaded, and it had five rounds remaining in the clip. (Bennett was not questioned about the status of the .45 weapon upon discovery.) The Tennessee Bureau of Investigation crime lab matched the five casings recovered from the crime scene to the Phoenix .22 semi-automatic handgun.

. . . .

Eric Benion, one of the victims, testified that he was with Kenneth Blair, Marcus Williams, and Charles Massengill, at 580 Dooley Street on May 22, 1998, when the shooting incident occurred. Benion and Williams had started the evening at Benion's house. When Benion's girlfriend became argumentative, Williams and Benion left to go to Williams' apartment. As they were leaving, Massengill also showed up and they invited him along. Blair arrived at Williams' apartment later on. The men spent the majority of the evening sitting on the balcony talking and joking and drinking a few beers. They noticed three black women with three black men in the parking lot downstairs. One of the men (the codefendant, Malone) approached them, asking whether anyone had change for a fifty-dollar bill. They replied that they did not. Malone then asked whether they had an extra beer, but they did not have a

spare beer either. Thereafter, Malone rejoined his friends, Sanford and Defendant, in the parking lot. It appeared to Benion as though they were leaving, but soon afterward they returned and ran up the stairs to where Benion and his friends were sitting on the balcony. Benion identified Defendant as one of the persons who ran up the stairs.

All three men--Defendant, Sanford, and Malone--had guns, and they ordered Benion and the others onto the floor. Benion did not obey right away, but ran back into the apartment. Malone found him and ordered him back outside with the others. Massengill was in a chair; the others were laying on the ground. With his gun pointed at Benion and Williams, Malone proceeded to look through their pockets for money. He took $28.00 from Benion. No one resisted or argued with the armed men during the robbery, but then Benion heard Blair mumble something unintelligible. In response, Benion heard one of the gunmen respond, "What? What?" and the shooting started. At this point, Benion jumped up, ran back into the apartment and leaped through the second story window. When he landed, he ran to another apartment building and asked a friend to call the police. He had been shot in the hand during his escape. Benion gave the police a description of the shooters' car and a statement, and then identified Defendant from a lineup at the police department later that evening.

Marcus Williams testified that he resided in the apartment which became the scene of the shooting incident. Prior to the shooting, Williams and Benion were pitching horseshoes at Benion's house. When Benion and his girlfriend began to argue, they decided to go to Williams' apartment. Massengill arrived as they were leaving, so they invited him to come along. About an hour later, Blair joined them and they all had a few beers together. By this time, Sanford, Malone and Defendant were observed talking to some girls in the parking lot. Williams recognized the girls from the neighborhood, but had never seen the men before. Two of the girls came upstairs to where Williams and his friends were sitting on the balcony and asked whether anyone had a quarter. The three men followed them. Malone asked for a beer and whether anyone had change for a fifty-dollar bill. Williams told him that they had neither.

Williams testified that, after he refused Malone's requests, everything happened very quickly. The three men ordered Williams and his friends down onto the floor. All three carried guns. Williams saw what appeared to be two .22 caliber weapons and a .45 caliber handgun. Benion jumped up and ran into the house, but they made him come back outside. Then Defendant and Sanford searched the victims' pockets for money. Having taken their money, the gunmen were preparing to leave when Blair mumbled something that Williams could not understand. In response, one of them turned around and said "What?" Then the shooting started. Williams and Benion immediately jumped up and ran into the apartment. Benion

-4-

leaped out the window and notified the police. Williams locked the door behind him, and stayed in the apartment until the ambulance arrived. He heard three more gunshots before the men left. When he emerged, he observed Massengill leaning over the rail and bleeding. Blair appeared dead. Benion had been shot in the hand as he escaped. Massengill had gunshot wounds in the knee and lower back.

Williams further testified that none of the victims resisted the gunmen, and he identified Defendant as one of the three men who took part in the robbery. On cross-examination, Williams admitted that his blood alcohol level was 0.13 when the hospital tested him and that he drank three beers during the evening of the incident.

Charles Massengill, also a victim of the shooting, testified that he went to Williams' apartment after work at approximately 11:00 p.m. He was drinking beer with Benion, Williams, and Blair. They were not bothering anyone. The first person to approach them was Malone who wanted change for a fifty-dollar bill. When they told him that they did not have change, Malone went back downstairs but came back fifteen or twenty minutes later with Sanford and Defendant. Massengill observed that Defendant and Sanford had guns. Sanford made Massengill sit in a chair and pointed a gun at his right eye. Malone ordered Benion, Williams, and Blair outside onto the balcony and made them lie down face first. Defendant pointed his gun at Blair while the three men searched the victims' pockets for money. They took 79 cents from Massengill, and then Blair mumbled something. Defendant responded with the words, "You say what?" and then shot Blair. Immediately afterward, Sanford shot Massengill in the right eye and he lost consciousness. He awoke later, in the hospital, with an eye injury and fractured neck. His blood alcohol was reported as 0.10.

. . . .

Anthony Reid, the defendant, testified that he lived in Chattanooga, Tennessee, and admitted that he had previously been convicted for possession of cocaine with intent to sell. On the day of the shooting, Defendant had been out of jail for approximately five months. He and his half-brother, O'Neal Sanford, and a man named Orlando Malone had decided to come to Cleveland to visit a friend and sell drugs, specifically, crack cocaine. Defendant had approximately $250.00 worth of crack cocaine in his possession when they arrived in town. Shortly thereafter, they met some local girls who "wanted to drink or kick it" with them. Defendant testified that he and Malone were mainly interested in "getting drunk" and "having sex" at that point. The women asked Defendant and his companions to follow them to a grocery store near the apartment building at 580 Dooley Street, where the men proceeded to spend two and one-half hours talking with the women in the parking lot and selling drugs to passersby. Defendant noticed the crowd of people standing on the balcony of Williams' apartment, but they did not engage in any conversation.

After Defendant and his companions returned from renting a motel room at the request of the women, Malone went up the stairs near Williams' balcony "to get the females" who were waiting in an apartment nearby. On his return, he stopped to talk to Williams and his friends about something. Defendant testified that he did not know what the conversation was about and that no one appeared angry afterward. Defendant admitted that, at this point, he and his friends were intoxicated. Malone wanted the women to come to their motel room, but they told him they needed to make a phone call first. While the men waited for the women to return, Malone went back to ask the people at the Williams' apartment for a beer. When he came downstairs empty-handed, Sanford went back up the stairs with him. It started raining, so Defendant went upstairs also. When he reached the top stair, he heard arguing. Then "someone got pushed and a gunshot went off," so Defendant ran back downstairs to the car to "get out of the way."

Defendant testified that he had some difficulty getting the car to start. By the time he did, Sanford and Malone had jumped in the car with him and they all drove away. Defendant was frightened because he was on probation and was supposed to stay out of trouble. When the police spotted them and tried to pull them over, Defendant "mashed" the accelerator in an attempt to escape. Sanford ducked down, and Malone wrapped the guns inside of his shirt. Malone instructed Defendant to pull over to the side of the highway so he could throw the guns out of the car, and Defendant complied. When Defendant finally stopped the car, he tried to get away on foot, but the police caught him and arrested him.

Defendant further testified that, to the best of his knowledge, Malone and Sanford did not rob anyone of anything on May 22, 1998, and, furthermore, Defendant did not know that Malone and Sanford had guns with them that day. Defendant also testified that he did not have a gun, he did not shoot anyone, and he did not rob anybody that evening. Defendant claimed his only interests centered on drugs and females.

On cross-examination, Defendant explained that, even though he had not done anything wrong, he ran from the police because he feared for his life. The Chattanooga police had recently killed one of his friends, and Defendant believed that the police might kill him too. With regard to the victims' testimony that Defendant carried a gun, he claimed that all three witnesses were either lying or must have confused him with someone else. Defendant claimed that he was far too busy running away to recall anything about the shooting incident, except for hearing gunshots.

State v. Anthony Reid, No. E2000-02619-CCA-R3-CD, 2001 WL 818205, at *1-7 (Tenn. Crim. App., at Knoxville, July 20, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

In his amended petition for post-conviction relief, the Petitioner alleged that he was denied effective assistance of counsel at trial. The Petitioner also alleged that he was denied effective assistance of counsel on appeal when his trial counsel, William J. Brown ("Counsel"), failed to raise the issue of the sufficiency of the convicting evidence on direct appeal following the Petitioner's convictions. After a hearing, the post-conviction court dismissed the petition for post-conviction relief, and the Petitioner filed a timely notice of appeal. The Petitioner alleges that the post-conviction court erred when it dismissed his petition for post-conviction relief. The Petitioner avers that he did not receive the effective assistance of counsel because Counsel failed to challenge the sufficiency of the convicting evidence on direct appeal. Further, the Petitioner urges this Court to hold that "in all criminal appeals as of right that if the issue of sufficiency of the evidence is not presented to the appellate court, it is per se ineffective assistance of counsel."

The following evidence was presented at the post-conviction hearing. The Petitioner testified that, after his conviction but before his appeal, Counsel spoke with him only one time. The Petitioner explained that he raised "about 10 issues" that he really wanted Counsel to pursue on direct appeal when they spoke. The Petitioner stated that Counsel only raised three of these issues. The Petitioner recounted that he wrote Counsel a letter after he "had gone through the appeal to the Court of Appeals" asking him to raise several additional issues including: (1) whether evidence presented was sufficient to support a conviction; (2) whether it was possible to be convicted of first degree murder while one of the co-defendants was convicted of criminally negligent homicide; (3) whether he could be convicted of first degree murder if the victim died because he was "unplugged" in the Intensive Care Unit; (4) whether charges could be brought against a witness, Massengill, for false statements made while testifying; (5) whether the witnesses were allowed to talk with each other and to the prosecutor after the proceedings started but before the witnesses testified; (6) what could be done about inconsistent statements made by other witnesses who testified; (7) whether the use of inmates for the photo line-up violated his rights; and (8) whether money and property missing from evidence affected the Petitioner's credibility at trial or prevented Counsel from effectively cross-examining witnesses at trial. The Petitioner explained that, while he wrote the letter to Counsel after he "had gone through the appeal to the Court of Appeals," he had expressed to Counsel his desire to raise these issues on appeal prior to Counsel filing the notice of appeal.

The Petitioner testified that, after he was convicted, he mostly communicated with Counsel through letters because he "couldn't really get on the phone too much because it was a maximum security lock-down." The Petitioner stated that he did not have an opportunity to discuss his appeal with Counsel in person before Counsel filed the appellate brief.

The Petitioner testified that he asked Counsel to file a motion for a change of venue and the trial court denied the motion, but that Counsel did not raise this issue on appeal. The Petitioner testified that, in his petition for post-conviction relief, he raised the issue that the make-up of the jury violated his equal protection rights because there was not a representative mix of white people and black people on the jury. The Petitioner explained that he wanted a "half and half jury" made up equally of black people and white people, however, when the post-conviction court asked if he remembered how many black people were on the jury, the Petitioner stated, "I think . . . it probably

was just one or two." The Petitioner acknowledged that the issue of the jury's make-up was not raised on appeal, nor was it addressed in his letter to Counsel, but stated that either Counsel or Scott Kanavos, the Petitioner's attorney before Counsel, had filed a motion regarding the make-up of the jury. On cross-examination, the Petitioner explained that, while he testified that there may have been one or two black jurors in the jury panel, he was not sure if there were any at all. When asked if he remembered the State striking any potential jurors who were black during voir dire, the Petitioner stated that he could not remember that happening.

The Petitioner testified that the trial court failed to instruct the jury on lesser-included offenses, including negligent homicide and facilitation, although he admitted that he "didn't recall at all" the jury instructions from his trial. When asked by the post-conviction court how the allegation that the trial court failed to instruct the jury on lesser-included offenses made it into the post-conviction petition, the Petitioner explained, "I kind of figured that if they had convicted me of second degree murder that facilitation or criminally negligent homicide wasn't [] mentioned to them."

The Petitioner testified that he did not believe he received effective assistance of counsel. He explained that after the conviction, he spoke with Counsel only one time and that the conversation only lasted five minutes. The Petitioner stated that after the notice of appeal was filed his only interactions with Counsel were through written correspondence. The Petitioner explained that he made it clear to Counsel that he wanted the sufficiency of the convicting evidence issue raised on appeal.

The Petitioner testified that Counsel did raise the issue of the sufficiency of the convicting evidence in the motion for new trial, but that the motion was denied. The State then read the following portion of this Court's opinion on direct appeal which addressed the sufficiency of the convicting evidence:

> During the trial, the State made out a strong case against Defendant, presenting substantial proof from which the jury could determine that Defendant was guilty of the offenses charged beyond a reasonable doubt. Defendant claimed that he was not directly involved in the robbery or the shooting, yet three eyewitnesses testified that he was present with a gun and that he actively participated in the robbery. One of the eyewitnesses actually observed Defendant shoot the victim who subsequently died. Defendant claimed that these eyewitnesses either committed perjury or mistakenly confused him with someone else, yet presented no reason for their collective bias or proof that anyone other than Malone, Sanford, and Defendant were present . . . . Viewing the record as a whole, we cannot find the State's improper reference to Defendant's pretrial silence made in one brief exchange during a two-day trial had a prejudicial effect upon the jury's verdict, given the overwhelming evidence tending to establish Defendant's guilt.

Reid, 2001 WL 818205, at *10. The State then presented the Petitioner with a copy of the jury instructions provided to the jury at the Petitioner's trial, but the Petitioner stated that he never saw the document before and was unable to confirm or refute that the document was the jury instructions. The Petitioner reiterated that he could not recall the judge instructing the jury, rather, he "just remember[ed] hearing the guilty verdict being read."

The Petitioner admitted that, while he had asked the post-conviction court to set aside his conviction because the trial court denied his motion for a change of venue, he did not know anyone on the jury panel, he was not from the Cleveland area, and, to his knowledge, no one on the jury panel or in the jury pool from which the jury was chosen knew who he was prior to the trial. The Petitioner stated that during the voir dire process the potential jurors were asked if they knew anything about the case from having heard about it in the media, and he did not remember anyone stating that they knew about the case.

The State called Denise Barnes, the court reporter from the Petitioner's trial. Barnes testified that she prepared the jury charge for the trial court, and she recognized the verdict report forms from the Petitioner's case. Barnes explained that, while she could not specifically remember Judge Ross instructing the jury in the Petitioner's case, she has never been in a trial with the judge when he did not instruct the jury from the charge she prepared. When asked what she would do if the judge sent the jury out for a verdict without reading a jury charge, Barnes stated that she would tell him that he forgot to charge the jury. Barnes testified that this did not happen in the Petitioner's case and something like forgetting to charge the jury would leave an impression.

Counsel testified that he has practiced as an attorney since September of 1977 and had been an assistant district attorney for approximately nine years at the time he started his private practice. Counsel stated that, as an assistant district attorney, he prosecuted "substantially more than 10" homicide cases. Counsel explained that, since he left the district attorney's office, criminal law has remained a component of his private practice, including some homicide cases.

Counsel testified that he was court-appointed after the Petitioner "got disgruntled" with Kanavos, his former attorney. Counsel explained that after he was appointed, he interviewed witnesses and talked with police officers and the Petitioner to try to determine exactly what the facts of the case were. Counsel stated that, while he had not reviewed his file pertaining to the Petitioner's case prior to the post-conviction hearing, he remembered that he "expended a good deal of effort" in defending the Petitioner. Counsel testified that he filed at least one motion to dismiss the charges against the Petitioner for technical defects. Counsel recalled that this was one of the "substantial issues" raised on appeal.

Counsel was asked to identify the judge's jury charge and testified that the charge contained lesser-included offenses charged for each offense. Further, Counsel testified that the judge charged the jury with lesser-included offenses. Counsel recalled preparing for the appeal:

I was sitting in . . . my home on Saturday evening, trying to prepare this to submit to the Court of Appeals, and reading extensively over the transcript of the trial, I consciously evaluated the issue of . . . the sufficiency of the evidence. I had . . . discussed with [the Petitioner] the fact that this was really going to be a swearing contest. There's no question that people got shot and a person was killed. [The Petitioner], in discussing the case with me, indicated he didn't know anything about what was going on . . . . in terms of trying to say what we were going to argue in terms of sufficiency of the evidence, it really broke down to whether or not the jury believed those individuals who testified or believed him. Now, the witnesses themselves, the victims themselves had some inconsistencies, as I recall . . . . One said, I think [the Petitioner] pulled the trigger and the other one said he didn't, or something along those lines. But when I'm sitting there trying to come up with a reason to argue to the Court of Appeals with any sense of propriety, in reading that transcript over and over and over again, I couldn't say that a reasonable jury listening to that evidence could not pull out some proposition that [the Petitioner] was involved in this robbery and did participate, either as an accomplice or as a principle in the shooting that occurred.

Counsel further explained that, although there were inconsistencies in the witnesses' testimony, all of the witnesses clearly stated that the Petitioner was involved in the crime. He testified, "I just couldn't come up with something that I could write with any reason to say that, that a jury couldn't have gleaned something out of the evidence. And really, the credibility of [the Petitioner] was [] most important . . . ."

Counsel testified that he felt the strongest argument on appeal was that the Petitioner's right to remain silent was denied. Counsel explained that the State asked Detective Bennett during cross-examination whether the Petitioner had cooperated with the police, and that Detective Bennett said that the Petitioner had been unwilling to give a statement or cooperate with police. Counsel stated that he felt this was the strongest argument on appeal because it "implicated [the Petitioner's] credibility, and may have provided some basis for the jury to assign less credibility to him than the others, simply because he didn't give his story to them at that time."

Counsel explained that he "wanted to focus on the issue of credibility as opposed to try to analyze the nuances of what each witness said and how it may have contradicted the other . . .," because he was concerned that arguing the sufficiency of the convicting evidence claim would deflect from the credibility argument. He stated that:

I would much rather them focus like a laser beam on what I felt like was the critical thing that would provide [the Petitioner] a new trial, as opposed to [] writing 50 pages of this witness said this and this contradicts this witness who said that . . . when I know full well that the only thing [the Court of Criminal Appeals has] to say is the jury believed this person and disbelieved everybody else and that's sufficient

-10-

to convict. . . . Now would that have adversely affected [the credibility argument]? It may, it may not have, but that was my strategy.

On cross-examination, Counsel reiterated that there were inconsistencies in the statements given by witnesses at the trial, but explained that he felt the crucial damage to the Petitioner's case was the testimony provided by Detective Bennett stating that the Petitioner was uncooperative. Counsel testified that, if the Petitioner's credibility was damaged by Detective Bennett's testimony, he did not see how the Court of Criminal Appeals could find the error to be harmless because of the damage to the Petitioner's defense.

Counsel recalled that, prior to the trial, he and the Petitioner spoke extensively about trial preparation and trial strategy, including who to call as witnesses. Counsel explained that he raised several issues at the Petitioner's request including the character of the jury, but that he "didn't really see a whole lot of substance to that issue." Counsel was shown a document in which the Petitioner requested an interlocutory appeal from the denial of the motion for a change of venue, and he explained that the reason he did not file the appeal was that the trial court told them that the case was going to be tried and he felt the issue was "not substantial."

Counsel testified that, while he spoke with the Petitioner regarding his appeal, he did not specifically remember discussing whether or not to raise the sufficiency of the convicting evidence issue on appeal. He explained, "I would not contradict anything [the Petitioner] said about us having conversations about that. I feel confident though . . . that if and when we did have those conversations, I would have explained to him my thought processes about why that wasn't raised." Counsel reiterated that he wanted the appellate court to focus on the issue of Detective Bennett's statements attacking the Petitioner's credibility. Counsel stated that, while the appeal was not successful, it was a deliberate strategy to focus on the issue of credibility rather than to raise the issue of witnesses' testimony that was inconsistent as to minor issues.

The post-conviction court reviewed the verdict forms and stated that the jury found the Petitioner guilty of first degree murder in the perpetration of aggravated robbery. Counsel agreed and stated that "that was another . . . strong issue on dealing with this consideration of raising sufficiency of the evidence, because all [the jury] had to do was find that he . . . participated in it, whether he pulled the trigger or not . . . ."

Following the presentation of the evidence, the post-conviction court found that the Petitioner was not denied effective assistance of counsel and dismissed the petition, holding the following:

> Petitioner was represented at the original trial in this case by [Counsel]. Trial counsel testified at the hearing on Post Conviction Relief that he had expended a great deal of time in preparation for this trial. Counsel vigorously argued pretrial motions in this case, and, after conviction at trial, argued the issues he felt to be relevant on appeal.

Petitioner made allegations that he wanted trial counsel to raise the issue of 'sufficiency of evidence' at the appeal in this matter, and that it was not done. Counsel testified that his decision not to raise the 'sufficiency of evidence' issue on appeal was a conscious decision on his part. Trial counsel stated that he thought his better chances on appeal consisted of those issues with some merit, especially the issue concerning one of the state's officer witnesses at trial testifying that the [Petitioner] 'did not cooperate with' him when he tried to get a statement from him upon his apprehension after the Interstate chase.

While the issue of 'sufficiency of evidence' was not specifically dealt with at the appellate level, the court there made rather significant comments on the evidence when they held that any reference to the Petitioner's refusal to give a statement was harmless error.

. . . .

The proof against Petitioner . . . at trial was overwhelming, and there is no merit to his argument that trial counsel was ineffective by not raising the issue of 'sufficiency of evidence' on appeal.

. . . .

Petitioner has not met his burden and failed to show that [Counsel] was in any way ineffective either in the way he tried the case or in the way he handled the appeal, and any and all allegations that [Counsel] was ineffective are without merit and provide no grounds on which Post Conviction Relief can be granted.

Any and all other grounds raised by the Petitioner either in his original petition or in any amendments thereto are found to be without merit and are hereby dismissed.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed

question of law and fact and, as such, is subject to <u>de novo</u> review.  <u>State v. Burns</u>, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. <u>Id.</u>; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975).  This right to representation includes the right to "reasonably effective" assistance.  <u>Burns</u>, 6 S.W.3d at 461.  In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. <u>Baxter</u>, 523 S.W.2d at 936.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result.  <u>Id.</u> at 687; <u>Cooper v. State</u>, 849 S.W.2d 744, 747 (Tenn. 1993).  To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt.  <u>Strickland</u>, 466 U.S. at 695.  This reasonable probability must be "sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694; <u>see also</u> <u>Harris v. State</u>, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances.  <u>Strickland</u>, 466 U.S. at 690; <u>State v. Mitchell</u>, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).  The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time.  <u>Strickland</u>, 466 U.S. at 690; <u>Cooper</u>, 849 S.W.2d at 746; <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982).  In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Burns</u>, 6 S.W.3d at 462.  Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result.  <u>Williams v. State</u>, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

On appeal, the Petitioner argues that the post-conviction court erred when it found that the Petitioner was not denied effective assistance of counsel.  Specifically, he asserts that the post-conviction court erred when it found there was no merit to the Petitioner's claim that Counsel was ineffective by not raising the issue of the sufficiency of the convicting evidence on appeal.  Further, the Petitioner urges this Court to hold that "in all criminal appeals as of right that if the issue of sufficiency of the evidence is not presented to the appellate court, it is per se ineffective assistance of counsel."

Citing <u>Johnson v. State</u>, 733 S.W.2d 525 (Tenn. Crim. App. 1987), and <u>Rhoden v. State</u>, 816 S.W.2d 56 (Tenn. Crim. App. 1991), the Petitioner acknowledges in his brief that "as it currently stands the sufficiency of the evidence is not reviewable in a post-conviction case," and that "[t]he determination of which issues to present on appeal is a matter of counsel's discretion." <u>State v. Swanson</u>, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984).  Further, the Petitioner concedes that "the

failure of counsel for a criminal defendant to argue every single issue that a case may present or to present every issue in an appeal that a client may request is not per se ineffective assistance of counsel." See Swanson, 680 S.W.2d at 491.

In support of his argument, the Petitioner alleges that by holding that failure to raise the issue of the sufficiency of the convicting evidence is per se ineffective assistance of counsel, this Court would "further the objectives of due process, restore the right of appeal to the convicted defendant, and further lessen the likelihood that a defendant will be convicted without there being substantial proof beyond a reasonable doubt." The Petitioner further alleges that classifying the decision not to present the issue of the sufficiency of the convicting evidence on appeal as a "tactical decision[] or strategic decision[]" is not a valid argument. The State argues that the Petitioner failed to show that: (1) Counsel's representation at trial and on appeal was "in any way deficient or that [it] failed to meet the standard of competence demanded of attorneys in criminal cases;" or (2) "raising the issue of insufficiency of evidence would have made any difference in the final outcome of his case."

First, we conclude that Counsel was not ineffective by failing to raise the issue of the sufficiency of the convicting evidence on appeal. Counsel testified at the post-conviction hearing that he decided that the issue of the sufficiency of the convicting evidence was not a viable issue to raise on appeal. Counsel further testified that he evaluated the witnesses' inconsistencies but concluded that all of the witnesses clearly stated that the Petitioner was involved in the crime. Counsel recalled that he made the strategic decision to focus the appeal on what was "most important" and the strongest argument on appeal. Counsel determined that the Petitioner's strongest issue on appeal was the State's improper attack on the Petitioner's credibility. Counsel concluded that the State's reference to the Petitioner's pre-trial silence "may have provided some basis for the jury to assign less credibility to [the Petitioner] than the others, simply because he didn't give his story to them at that time." Counsel explained that he "wanted to focus on the issue of credibility" as opposed to arguing that the evidence was insufficient to convict the Petitioner because he was concerned that arguing the sufficiency of the convicting evidence claim would deflect from the credibility argument.

Counsel adequately considered potential issues to raise on appeal and concluded that the issue of the sufficiency of the convicting evidence lacked merit and may have even had an adverse effect on the credibility argument. We must evaluate the questionable conduct from Counsel's perspective at the time of his conduct with "a strong presumption that [his] conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard, 629 S.W.2d at 9. Furthermore, Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams, 599 S.W.2d at 279-80. Moreover, this Court has held that "[c]ounsel is not constitutionally required to argue every issue on appeal, or to present issues chosen by his client . . . . The determination of which issues to present on appeal is a matter of counsel's discretion." Swanson, 680 S.W.2d at 491.

-14-

While Counsel failed to raise the issue of the sufficiency of the convicting evidence on appeal, his conduct at the time fell "within the wide range of reasonable assistance." Burns, 6 S.W.3d at 462. Counsel made a tactical decision to focus this Court's attention on the issue of the State's attacking the Petitioner's credibility and, while he was unsuccessful, Counsel should not be deemed to have been ineffective merely because a different strategy might have produced a different result. Williams, 599 S.W.2d at 279-80.

Even if we were to find that Counsel erred by failing to raise the issue of the sufficiency of the convicting evidence on appeal, the Petitioner has presented no evidence of prejudice or that the outcome would have been different. In fact, this Court addressed the issue of the sufficiency of the convicting evidence on the direct appeal. This Court commented that the State made a strong case against the Petitioner, "presenting substantial proof from which the jury could determine that [Petitioner] was guilty of the offenses charged beyond a reasonable doubt." Reid, 2001 WL 818205, at *11. Accordingly, we conclude that the Petitioner failed to meet his burden of proving that he was prejudiced by Counsel's failure to raise the issue of the sufficiency of the convicting evidence on appeal. The Petitioner failed to show a reasonable probability that, but for Counsel's failure to raise the issue of the sufficiency of the convicting evidence on appeal, this Court would have found that the evidence was insufficient to "undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Harris, 875 S.W.2d at 665. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

Finally, based upon the foregoing, we respectfully decline the Petitioner's invitation to hold that "in all criminal appeals as of right that if the issue of the sufficiency of the evidence is not presented to the appellate court, it is per se ineffective assistance of counsel." As previously stated, the determination of what issues to present on appeal is a matter of counsel's discretion.

### III. Conclusion

Thus, we conclude that the post-conviction court properly found that the Petitioner failed to prove ineffective assistance of counsel by clear and convincing evidence and that Counsel fully discharged his duties as the Petitioner's attorney at both the trial and appellate level. Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____

ROBERT W. WEDEMEYER, JUDGE

-15-